TRADAX ENERGY, INC., Plaintiff,

v.

CEDAR PETROCHEMICALS, INC., Defendant.

No. 03 Civ. 997(VM).

United States District Court, S.D. New York.

April 28, 2004.

Eric D. Grayson, Greenwich, CT, for defendant.

Michael Robert Hepworth, Piper & Marbury L.L.P., New York, NY, David P. Langlois, Piper Rudnick LLP, New York, NY, for plaintiff.

## DECISION AND ORDER

MARRERO, District Judge.

In this contract dispute, one commodities trader, defendant Cedar Petrochemi-cals, Inc. ("Cedar"), failed to deliver a certain shipment of methanol to another commodities trader, plaintiff Tradax Energy, Inc. ("Tradax"). Primarily at issue in the parties' cross motions for summary judgment is whether there is a genuine issue of fact to suggest that Tradax had repudiated the contract, thereby relieving Cedar's obligation to deliver the methanol. The Court concludes that, as a matter of law, Tradax did not repudiate. Cedar's motion is therefore denied.

Tradax's motion is granted only in part, however, because certain documents necessary to proving Tradax's damages are not admissible. Because that evidence suffers from a relatively technical defect, the Court will permit Tradax to supplement its submissions.

## I. BACKGROUND [1]

In September 2002, Tradax contracted to purchase 10,000 barrels of methanol from Cedar, to be delivered to Houston, Texas, on a specific date sometime in January 2003, which Tradax would later specify, upon at least five days' notice. Cedar refused to deliver the methanol, which Tradax ultimately obtained from another source. By its summary judgment motion, Tradax seeks to recover from Cedar $184,380, an amount equal to the difference in the contract price and the price Tradax asserts it actually paid for the methanol. Cedar's cross motion asserts that Tradax repudiated the contract in a December 2002 phone call, and Cedar seeks judgment in its favor. The legal effect of that phone call is the central issue to both motions.

---

1. The factual summary derives from (1) the declaration of Walter A. Huybregts ("Huybregts Decl."), dated Feb. 26, 2004, (2) the affidavit of Linda Plevrites ("Plevrites Aff."), dated Mar. 25, 2004, and (3) the affidavit of Salim Harfouche, dated Mar. 25, 2004, as well as the exhibits attached to those documents. Except where necessary, the Court will not cite these sources further.

In the phone call at issue, which occurred sometime in December 2002, Tradax president Walter Huybregts ("Huybregts") spoke with Cedar bookkeeper Linda Plevrites ("Plevrites") regarding a certain Texas state tax form. Plevrites's account of the phone call, which Huybregts disputes, is as follows:

Q: This one telephone call that you had, who called who?

A: The phone rang, I answered. It was Tradax.

Q: Who at Tradax was on the phone?

A: I don't recall. He probably said his name, I don't recall.

Q: It was a man?

A: It was a man.

Q: And what exactly was said in this conversation – maybe – first of all, how long was the conversation you had?

A: Oh, three minutes.

Q: And what, to the best of your memory, exactly was said in that conversation?

A: Well, I can't tell you exactly, but this man asked for our Texas sales certificate, or whatever it's called, the certificate relating to sales tax. And I told him we didn't have it yet to give to him. And he was very annoyed because they needed it and I knew that we were going to get it, we hoped soon, but I had no idea. And, you know, he – urging me to get on the ball and et cetera, and said that if we didn't get it – if we didn't get it to them, then they wouldn't pay us.

Q: Did he use those words?

A: Um-hmmm.

Q: And did you tell him you would get it to him?

A: Yeah.

Q: Do you remember anything else about the conversation?

A: No. He wanted that certificate and I knew we could get it to him at some point and told him so.

Q: Did the person at Tradax say he was cancelling the contract – any contract?

A: No.

Q: Did he say he was repudiating any contract?

A: No.

Q: Do you know at any time, in connection with any contract Tradax and Cedar had, whether Tradax refused to pay on a contract?

A: I'm not aware of any – anything related to that.

(Huybregts Decl. Ex. 16, at 25–27)

Plevrites immediately informed her supervisors of the conversation, and Cedar asserts it then considered the contract cancelled. However, Cedar never alerted Tradax that it (Cedar) considered the contract cancelled until after Tradax e-mailed Cedar on January 7, 2003, to specify a delivery date of January 13. On the same day as Tradax's email, Cedar's president sent Tradax a letter indicating, for the first time, that Cedar considered the contract to have been cancelled:

> When you called our office the first time and advised that you were not going to pay us for this transaction unless we had a tax exemption certificate, which we did not have, we viewed your refusal to pay as an anticipatory breach of the contract.

(Huybregts Decl. Ex. 13)

■ The sales tax certificate referenced in the phone call and Cedar's letter does not directly relate to the contract at issue here. Under Texas law, a seller may avoid charging a buyer the otherwise applicable state sales tax if the buyer furnishes the seller with a Texas Resale Certificate,

which states that the items purchased are for resale. Tradax had previously sold commodities to Cedar (the reverse of the transaction at issue here), and Tradax wanted Cedar to fill out a Texas Resale Certificate to reflect that Tradax acted lawfully in not charging Cedar sales tax for those transactions.

After her conversation with Huybregts, Plevrites filled out the one-page Texas Resale Certificate form for Tradax and dated it December 15, 2002. For reasons which are unclear, Plevrites never obtained the required signature from the proper Cedar official, nor did she mail the form to Tradax.

## II. *SUMMARY JUDGMENT STANDARD*

The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," *i.e.*, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

Where the moving party would bear the burden of persuasion at trial, that party must first make a *prima facie* case by "support[ing] its motion with credible evidence ... that would entitle it to a direct-ed verdict if not controverted at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party would bear the burden of persuasion at trail, the moving party can make its *prima facie* case by either "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or "demonstrat[ing] to the Court that the nonmoving party's evidence is insufficient to establish an essential element" of the claim. *Id.*

After such a *prima facie* showing, the non-moving party must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). In other words, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996).

## III. *DISCUSSION*

As a threshold matter, the Court must determine which law to apply to this diversity action. The contract at issue does not specify which law to apply, and Tradax's brief asserts that it is entitled to judgment under a straightforward application of the Uniform Commercial Code ("UCC"), the

relevant provisions of which have been adopted in both Texas and New York. Cedar does not appear to take a position on the choice of law issue. The Court concludes that the dispute is governed by New York law.

To determine which law applies to this diversity action, this Court applies the choice-of-law principles of the state in which the Court resides: New York. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, the " 'center of gravity' or 'grouping of contacts' choice of law theory applie[s] in contract cases." *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 939 (1993). Five key factors govern that determination: "the place of [1] contracting, [2] negotiation and [3] performance; the [4] location of the subject matter of the contract; and the [5] domicile of the contracting parties." *Id.* at 940 (citing Restatement (Second) of Conflict of Laws § 188); *see also Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1538–39 (2d Cir.1997).

Tradax is a Delaware corporation with its principal place of business is Texas. Cedar is a New York corporation with its principal place of business in New York. The contract was arranged through a New York broker. As stated, the methanol was intended to be delivered to Texas, where Tradax is located. Cedar does not actually produce methanol (it buys and resells it), so it does not make sense to describe the "location" of the subject matter of the contract.

With these facts in mind, the Court concludes that the center of gravity of this contract slightly favors New York over Texas. The Court notes that Tradax, the party on whose behalf Texas would theoretically have an interest in this litigation, has essentially conceded that New York law may govern. *Cf. Martin v. City of Cohoes,* 37 N.Y.2d 162, 371 N.Y.S.2d 687, 332 N.E.2d 867, 869 (1975) ("[P]arties to a civil litigation, in the absence of a strong countervailing public policy, may consent ... by their conduct, to the law to be applied."). In any event, the Court agrees with Tradax that this case involves basic contract principles which would apply under both New York and Texas law.

Under the UCC (adopted in New York), a party may "suspend his own performance" under a contract if the other party "repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the" aggrieved party. N.Y. U.C.C. § 2–610. "[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Id.* cmt. 1. The New York Court of Appeals has held that a party may consider a statement as anticipatory repudiation only where "the announcement of an intention not to perform was positive and unequivocal." *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978).

A demand "for more than the contract calls for in the way of counter-performance is not in itself a repudiation," but when such a statement "amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation." N.Y. U.C.C. § 2–610 cmt. 2. Under New York law, the party asserting the anticipatory repudiation bears the burden of persuasion. *See Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir.1989).

Cedar argues that Huybregts's demand for the Texas Resale Certificate added a condition "beyond the contract," N.Y.

U.C.C. § 2–610 cmt. 2, thereby counting as a repudiation. The Court disagrees.

As an initial matter, the Court emphasizes that the allegedly demanded condition was virtually trivial. The simple one-page form is available on the internet and merely asks for the buyer's name, address, a description of the items purchased, and a description of the type of business in which the buyer is generally engaged.[2] The Court doubts that such a trivial demand could amount to either a "positive and unequivocal" intention not to perform on a contract worth more than $200,000, *Tenavision, Inc.*, 408 N.Y.S.2d 36, 379 N.E.2d at 1168, or the type of demanded additional condition contemplated under UCC § 2–610.

More fundamentally, however, Cedar *agreed* to the demand. Plevrites told Huybregts that she *would* provide the form. In that regard, Cedar's focus on anticipatory repudiation is misplaced. The brief conversation is better conceptualized as a modification of the contract under UCC § 2–209. *See* N.Y. U.C.C. § 2–209 ("An agreement modifying a contract within this Article needs no consideration to be binding."). Cedar also overlooks UCC § 2–609 which – if Cedar indeed doubted that Tradax would pay – would have permitted Cedar to secure adequate assurance of that payment. *See id.* § 2–609(1) ("When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."). Because the Court concludes that Tradax did not repudiate the contract, the Court grants Tradax's motion with respect to the issue of Cedar's breach.

█ The parties also dispute the measure of Tradax's damages. Crucial to this determination are documents, attached to Huybregts's affidavit, which relate to Tradax's purchase of methanol from another source in an effort to "cover" for Cedar's breach. Cedar correctly points out that those documents would be inadmissible hearsay and hence cannot be part of the Court's consideration.

On a motion for summary judgment, supporting affidavits must state facts which "would be admissible in evidence" at a trial. *See* Fed.R.Civ.P. 56(e). The documents at issue are inadmissible hearsay to the extent that they are offered to support the existence of the transactions described for the purposes of establishing the amount of damages recoverable. *See* Fed. R.Evid. 801.

█ Of course, business documents are routinely admitted into evidence at trials under the business records exception of Federal Rule of Evidence 803(6). The business records exception permits courts to admit records which would otherwise be hearsay if "the testimony of the custodian or other qualified witness" shows that the records were "kept in the course of a regularly conducted business activity," and that "it was the regular practice of that business activity" to keep such records. Fed.R.Evid. 803(6). The custodian or other qualified witness "need not have personal knowledge of the actual creation of the document." *Phoenix Associates III v.*

---

**2.** Cedar has submitted an affidavit stating that the condition was a "long and complicated process" which required it to "hire an outside firm from Texas." (Plevrites Aff. ¶ 2) Cedar offers no further explanation as to how filling out a simple form – which Cedar apparently did fill out – could possibly be difficult. This vague and unexplained allegation falls short of the type of "specific facts" which Cedar must put forth to defeat Tradax's motion for summary judgment. *See* Fed.R.Civ.P. 56(e).

*Stone,* 60 F.3d 95, 101 (2d Cir.1995) (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(6)(b)[04], at 803–201–04 (1994)).

In this case, Huybregts's affidavit merely identifies the relevant documents, without explaining whether they were kept in the ordinary course of business; there is no other affidavit from a document custodian. The Court therefore cannot consider the evidence. *See Woods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir.2000) ("[A]t the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records.").

The Court recognizes that this defect is rather technical. In the typical summary judgment motion involving business documents, the record contains affidavits, almost certainly drafted by lawyers, in which the relevant custodian makes a declaration tracking exactly the language of Rule 803(6). Those affidavits may seem perfunctory and they may not receive much attention either in the briefing or in the courts' decisions, but those affidavits are necessary for admissibility under the Federal Rules. Were the Court to excuse the defect, the Court would be grafting a judicial exception upon the admissibility requirement of Federal Rule of Civil Procedure 56(e).

Turning to the case at hand, the Court would not be surprised to learn that Tradax, a commodities trading firm, keeps documents and contracts relating to its trades in the ordinary course of its business. In an effort to efficiently advance this litigation, the Court will permit Tradax ten days from the date of this Decision and Order to offer appropriate additional affidavits. The Court will also permit Ce-

dar to make a brief response. If the parties do not settle this matter before the parties' supplemental submissions have been filed, the Court will issue a separate order pertaining to damages.

## IV. *ORDER*

For the reasons stated, it is hereby

**ORDERED** that the motion of Tradax Energy, Inc. ("Tradax"), for summary judgment is granted in part and denied in part. The Court finds that Cedar Petrochemicals, Inc. ("Cedar"), breached the parties' September 2002 contract for the sale of methanol, and grants Tradax's motion as to liability. The Court reserves its decision as to damages until further submissions as provided herein; it is further

**ORDERED** that within ten (10) days of the date of this Order, Tradax shall file affidavits, if any, pertaining to the admissibility of documents relating to its "cover" purchase of methanol in January 2003, and Cedar shall be permitted ten (10) days from the date of service of those affidavits, if any, to file a letter response, no longer than three pages, addressing any new issues raised by those affidavits; and it is finally

**ORDERED** that Cedar's motion for summary judgment is denied.

**SO ORDERED.**